David Paul Steiner (SBN 64638)
Jonathan C. Balfus (SBN 155532)
dpsartnetlaw@gmail.com
**DAVID STEINER & ASSOCIATES, PLC**
1801 Century Park East, Suite 1600
Los Angeles, California 90067
Telephone: (310) 557-8422
Facsimile: (310) 556-0336

Attorney for Plaintiffs SIMCOR LLC
and ELLIS KING LTD.

Christopher L. Rudd (SBN 130713)
clrudd@ruddlawpc.com
**THE RUDD LAW FIRM, APC**
15233 Ventura Blvd. Suite 320
Sherman Oaks, California 91403
Telephone: (310) 457-4072
Facsimile: (310) 359-0258

Attorney for Plaintiff SIMCOR LLC

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SIMCOR LLC, a California limited liability company; and ELLIS KING LTD., an Ireland limited liability company,<br><br>　　　　　　Plaintiffs,<br><br>vs.<br><br>IBRAHIM MOHAMMED MAHAMA, an individual,<br><br>　　　　　　Defendant. | Case No.:  2:15-cv-4539<br><br>**COMPLAINT FOR:**<br><br>(1) **BREACH OF CONTRACT;**<br>(2) **FRAUDULENT INDUCEMENT;**<br>(3) **COMMERCIAL DISPARAGEMENT;**<br>(4) **UNFAIR COMPETITION;**<br>(5) **SPECIFIC PERFORMANCE; AND**<br>(6) **DECLARATORY RELIEF**<br><br>**JURY TRIAL REQUESTED** |

Plaintiffs SIMCOR LLC ("Simcor") and ELLIS KING LTD. ("Ellis King" and, together with Simcor, "Plaintiffs"), complain as follows against Defendant IBRAHIM MOHAMMED MAHAMA ("Mahama"):

## THE PARTIES

1. Plaintiff Simcor is a limited liability company organized under the laws of the State of California with its principal place of business in Los Angeles County, California. Stefan Simchowitz ("Simchowitz") is the principal of Simcor. Simcor provides independent fine art consultation, management and curating services to artists, galleries, collectors, foundations and exhibitors.

2. Plaintiff Ellis King is a limited liability company organized under the laws of the nation of Ireland and is in good standing. Jonathan Ellis King, a citizen of Ireland, is its principal. Ellis King owns and operates a fine art gallery in Dublin, Ireland.

3. Plaintiffs are informed and believe and thereon allege that Defendant Mahama, now a celebrated contemporary artist, is a citizen of the nation of Ghana, residing in Tamale, Ghana.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over the subject matter of this action under principles of diversity jurisdiction pursuant to 28 U.S.C. §1332. The amount in controversy exceeds the sum or value of $75,000, exclusive of interests or costs. Complete diversity of citizenship between the Parties is also present as Plaintiffs are citizens of California and Ireland while Defendant is a citizen of Ghana. Further, some of the inventory of artworks that are the subject of this action are stored in Los Angeles County. Lastly, this Court has jurisdiction under the Declaratory Judgment Act pursuant to 28 U.S.C. §§2201, 2202.

5. This Court has personal jurisdiction over Mahama because, on information and belief, Mahama has engaged in the sale of artwork to residents of the State of California and/or otherwise entered commercial transactions with

1 residents of the State of California within this judicial district; has conducted or attempted to conduct business and/or engage in commercial enterprises in the State of California within this judicial district; and has committed tortious acts which Mahama knew or should have known would cause injury to Simcor in the State of California.

6. Venue is proper before this Court pursuant to 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

7. Simchowitz is a renowned cultural entrepreneur. Having produced several acclaimed feature films and founded two major photographic licensing websites, Simchowitz currently specializes as an independent consultant and curator for modern art collectors and institutions. Simchowitz has had significant success in discovering, financially supporting and promoting unknown artists, guiding them from obscurity to international prominence. Mahama is one such artist. Simchowitz does business through Simcor, LLC, of which he is a managing member. Simcor is a California Limited Liability Company in good standing.

8. Prior to meeting Simchowitz, Mahama had little, if any, recognition in the Western art world. Mahama had never displayed his work in any gallery or exhibit outside Ghana, either individually or as part of a group. He had made few sales of his work, if any. His work was not included in the collections of any museums, and exhibitions of his work were limited to Ghana. In short, Mahama was virtually unknown to the art world and had no experience exhibiting his art outside of his home country.

9. In or about 2012, Simchowitz contacted Mahama through Facebook. Simchowitz had seen photographs of some of Mahama's pieces online, principally consisting of draped jute coal sacks, and thought that he showed promise. Simchowitz eventually introduced Mahama to Ellis King, and the parties agreed to work together.

10. In October 2013, the parties corresponded and orally agreed on the terms of a business arrangement (the "Contract"). Specifically, pursuant to the Contract, Simchowitz and Ellis King each paid Mahama £45,000—a total of £90,000—for six different allotments of jute coal sack material from Mahama (the "Lots"). The £90,000 figure was agreed upon because Mahama represented that he needed some of that amount to obtain the jute materials and the majority of the money to build and furnish an artist's studio and living space. The parties further orally agreed that two of the Lots, one measuring approximately 20x120 feet and the other measuring approximately 20x150 feet, would remain intact and would serve as the material for installations to be exhibited by Ellis King, and which would be owned by Plaintiffs (the "Installation Pieces"). The parties further orally agreed to create a series of smaller, unique artworks from the remaining four Lots by reducing them into three separate sizes (108"x54", 96"x48", and 72"x36") and mounting the fabric over stretcher bars, which would then be authenticated by Mahama's signature on the recto of the stretched frame (the "Individual Works"), and which Plaintiffs would have the exclusive right to sell.

11. All of the parties initially performed their respective obligations under the Contract. Plaintiffs paid Mahama in full for the six Lots. Plaintiffs paid an additional €1,650.00 to import the Lots to the United Kingdom. Plaintiffs hired a skilled artisan, Dylan Atkins ("Atkins"), to undertake the process of creating the Individual Works by cutting four of the Lots into the agreed sizes and mounting the fabric over stretcher bars for Mahama's signature.

12. Mahama visited Atkins at his studio in London to oversee and approve the stretching process. Based on Mahama's input, Atkins completed his work, assembling a total of at least 294 Individual Works, for which Atkins was paid approximately $67,000 by Plaintiffs.

13. On December 3 and 4, 2014, Mahama signed the 294 Individual Works at Ellis King's gallery in Dublin.

14. While Atkins was completing the Individual Works from four of the six Lots, Ellis King was erecting the Installation Pieces in its Dublin gallery. Two additional workers were hired by Ellis King to assemble and erect the Installation Pieces in the exhibition space.

15. From December 5, 2014 through January 10, 2015, Ellis King exhibited the Installation Pieces, titled "Civil Occupation" (the "Exhibition"). The Exhibition was a tremendous success and received extremely favorable reviews. As a result, the formerly unknown Mahama suddenly rose to fame. Of the 294 Individual Works, Plaintiffs sold 27 pieces to galleries and collectors in Los Angeles, New York, London, Paris, Cyprus, Belgium, Monaco, Greece and the United Arab Emirates. The average price in U.S. Dollars for each of the Individual Works sold was approximately $16,700.

16. Some of the remaining unsold inventory of 267 Individual Works is stored in Dublin; the rest in California. The value of the unsold inventory is approximately $4,450,000.

17. In addition to the 294 Individual Works, there are 15 more stretched but unsigned works of varying sizes in Simcor's possession in California (the "California Works"). These pieces were sent to California for display and sale by Simcor, with the understanding between Mahama and Simcor that Mahama would provide certificates of authenticity.

18. During the Exhibition, once Plaintiffs had brought Mahama to the public's attention and begun establishing a market for his work, Mahama began to breach the parties' Contract.

19. On information and belief, without advising either of the Plaintiffs, Mahama secretly made a new series of artworks substantially similar to the Individual Works.

20. On information and belief, during or close to the period the Exhibition was on display in Dublin, Mahama sold approximately 20 of his new pieces to a

collector in Los Angeles, with whom he attempted to arrange an artist studio residency to take place in Los Angeles, without either of Plaintiffs' participation, or knowledge.

21. In January 2015, Mahama wrote an email to Ellis King stating, for the first time, that he was "disappointed" with the Individual Works, although he had written to Ellis King the previous February that "the stretched work looks fine." Mahama went on to admit that he had sold his new works to the collector in California to "help me to raise funds" for his participation in the Venice Biennale, a major international contemporary art exhibition held every other odd year. Mahama concluded his email stating he wanted "to drop the representation" with Ellis King, and that his name should be removed from the gallery's website.

22. On or around May 2015, Mahama sent an undated letter to Ellis King asserting that he was the owner of the copyright in Installation Pieces, as well as the owner of the Installation Pieces themselves. He further stated that Ellis King did not have permission to use the Installation Pieces. He continued: "Permission was neither asked nor granted to reproduce parts of the works…[a]nd the resulting new works therefore constitute infringement of the artist's rights." Mahama went on to state that he intended to provide a "certificate of authenticity" for each of the two Lots comprising the Installation Pieces, and that, pending provision of the certificates, Mahama's invoices for the Lots purchased by the Plaintiffs "are considered as certificate of authenticity."

23. In Mahama's letter May 2015, he took the position that none of the Individual Works were authentic, despite his having signed them, and despite his knowledge that many of the Individual Works had already been sold. Further, Mahama stated that he was the owner of the copyright in and to all of the original six Lots purchased by Plaintiffs. Mahama admonished Plaintiffs not to display, sell or otherwise exploit that material, complaining that he had not agreed to the commercialization of his artworks.

24. On information and belief, Mahama is presently represented by new and different galleries, through which he is selling artworks identical to, or substantially similar to, the Individual Works and the California Works. Further, despite Mahama's statements to Plaintiffs regarding the commercialization of his artwork, Mahama is currently selling through his Italian gallery seven different photographs of his unadorned jute sacks, in series of five, for approximately $5,000 each.

25. On information and belief, Mahama did not use the £90,000 paid to him by Plaintiffs to build a studio. Rather, Plaintiffs are informed and believe Mahama invested that money in ventures with his father.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

26. Plaintiffs incorporate by reference Paragraphs 1 through 25 of this Complaint as though fully set forth herein.

27. Plaintiffs and Mahama entered into the Contract pursuant to which Plaintiffs would finance, install, advertise and host the Exhibit in exchange for ownership of the Installation Pieces, and for the exclusive right to create and market, at Plaintiffs' additional expense, the Individual Works and the California Works.

28. Pursuant to the Contract, Plaintiffs each paid £45,000 to Mahama for the Lots, and an additional £3,000 approximately to import them from Ghana to the United Kingdom.

29. Pursuant to the Contract, Plaintiffs paid €2,000 approximately to hold the Exhibit, which costs included the labor required to assemble and erect the Installation Pieces in the exhibition space. Plaintiffs incurred additional costs of approximately €1,500.00 to advertise and promote the Exhibit.

30. Pursuant to the Contract, Plaintiffs paid Atkins $67,000 to create the Individual Works by reducing them into agreed upon sizes and fastening them over stretcher frames, in order for Mahama to sign them.

31. Mahama was not required to do very much pursuant to the Contract; rather all the work – importing the material, assembling and installing the fabric pieces, and cutting and stretching the fabric lots to create the Individual Works and the California Works– was performed by individuals other than Mahama who were paid by Plaintiffs. Mahama's sole obligations pursuant to the Contract were to oversee the installation process for the Exhibit, approve the process employed by Atkins to size and stretch the Individual Works and the California Works, and to approve and sign the stretched pieces created by Atkins. With his signature, Mahama physically gave his imprimatur as to the provenance and authenticity of the Individual Works and was supposed to bestow the same authenticity on the California Works had he fulfilled his contractual obligations.

32. On information and belief, during or immediately after the Exhibition, without the knowledge of consent of Plaintiffs, Mahama created artworks identical or substantially similar to the Individual Works and sold them to collectors for tens of thousands of dollars.

33. Mahama has taken the position that he owns the copyright in all of the artwork created from the original six Lots, including the Installation Pieces, the Individual Works and the California Works.

34. On information and belief, Mahama has taken the position that none of the stretched pieces are authentic, despite his having personally signed the Individual Works and having agreed to sign the California Works.

35. On information and belief, Mahama took £90,000 (the equivalent of $148,500 U.S. Dollars) from Plaintiffs, most of which was supposed to fund the building of an artist's studio and residence. On information and belief, Mahama did

1  not spend any of that amount as promised, but instead invested the money in a
2  venture with his father.
3      36. As a result of Mahama's actions as hereinabove alleged, Mahama has
4  materially breached and repudiated the Contract.
5      37. Mahama's breach of the Contract has resulted in substantial damages to
6  Plaintiffs in an amount to be established at trial including, but not limited to, the
7  value of unsold inventory of the Individual Works, estimated at approximately
8  $4,450,000, the market for which Mahama has devalued and discredited.

## SECOND CLAIM FOR RELIEF
### (Fraudulent Inducement)

11      38. Plaintiffs incorporate by reference Paragraphs 1 through 25 of this
12  Complaint as though fully set forth herein.
13      39. Mahama represented to Plaintiffs that he intended to build a fully
14  integrated artist studio and living space with money Plaintiffs provided, and that he
15  would fulfill his obligations under the Contract by authenticating the Individual
16  Works and the California Works, thereby enabling Plaintiffs to establish a market
17  for those pieces, which were to be exclusively sold by Plaintiffs.
18      40. In reasonable reliance on Mahama's representations, Plaintiffs spent
19  hundreds of thousands of dollars to purchase and import the Lots, assemble and
20  erect the Installation Pieces for the Exhibition, promote and host the Exhibition, and
21  to create the Individual Works and the California Works. In the process, Plaintiffs
22  helped to transform a virtually unknown Ghanaian man in his twenties into an
23  internationally successful artist.
24      41. Mahama's representations were false when made to Plaintiffs.
25  Specifically, on information and belief, Mahama had no intention of allocating any
26  of the money Plaintiffs paid directly to him for the construction of a studio, instead
27  using the money in investments. Mahama further falsely represented that he
28  intended to fulfill his obligations under the Contract by signing the Individual

1  Works and the California Works, thereby enabling Plaintiffs to create a market for
2  the authentic pieces.

3  42. Mahama's true intentions regarding his participation in the Exhibit and
4  in authenticating the stretched pieces were also deceptive.  On information and
5  belief, Mahama secretly sold numerous artworks, for tens of thousands of dollars, to
6  collectors in California at or around the time the Exhibition was being held.
7  Mahama thus had no intention of honoring his agreement of exclusivity with
8  Plaintiffs.  On the contrary, Mahama used Plaintiffs to bring him to prominence and
9  wasted no time going behind their backs to start reaping the benefits of his new-
10 found fame.

11 43. But for Mahama's deceptive representations as to his intent to fulfill his
12 contractual obligations, Plaintiffs would not have invested the substantial amounts
13 of time, money and effort required to create a name for Mahama and establish a
14 market for his work.

15 44. As a result of Mahama's actions as hereinabove alleged, Plaintiffs
16 suffered damages, in an amount to be established at trial, in that they were
17 fraudulently induced into investing substantial sums of money to bring him into the
18 Western art world, only to have him disavow his relationship with Plaintiffs in an
19 attempt to discredit and to devalue the artwork they paid for – as well as claim
20 ownership of artwork they paid for – all in order to benefit himself at Plaintiffs'
21 expense and to their considerable financial detriment.

22 Plaintiffs are entitled to, and hereby seek, in addition to compensatory
23 damages, punitive damages as a result of Mahama's fraudulent conduct herein on
24 grounds that such conduct was knowing, willful, malicious and specifically
25 intended to cause harm to Plaintiffs and did, in fact, cause harm to Plaintiffs.

## THIRD CLAIM FOR RELIEF

### (Commercial Disparagement)

45. Plaintiffs incorporate by reference Paragraphs 1 through 25 of this Complaint as though fully set forth herein.

46. On information and belief, Mahama has publicly stated that the Individual Works and the California Works are not authentic, and that he is the owner of the Installation Pieces. Further, Mahama has made disparaging statements about Plaintiff Simcor and its member, Stefan Simchowitz, to various artists in Ghana and elsewhere with whom Simcor works that they should not do business with Simcor because of Simcor's improper and dishonest business practices. Upon information and belief, these disparaging statements have been made starting mid-January 2015 to the present.

47. Mahama's statements are knowingly, demonstrably false because he was handsomely paid for the materials for the Installation Pieces and because he personally authenticated the Individual Works by signing them himself.

48. Mahama's false statements were made with the express intention of eliminating the market for the inventory of Individual Works and the California Works in Plaintiffs' possession while increasing the market for his own, competing artworks.

49. As a direct and proximate result of Mahama's actions as hereinabove alleged, Plaintiffs have suffered damages in an amount to be established at trial including, but not limited to, the value of unsold inventory of the Individual Works, estimated at approximately $4,450,000, the market for which Mahama has devalued and discredited by his false and disparaging statements. In addition, Plaintiffs stand to suffer additional losses for which Mahama will be held liable if the Individual Works Plaintiffs already sold are deemed non-authentic, causing Plaintiffs to refund to the buyers the sale prices of those works.

50. Plaintiffs seek punitive damages for Mahama's action as hereinabove alleged because Mahama acted willfully and maliciously towards Plaintiffs in making his statements concerning the authenticity of the Individual Works and the California Works in that he knew such statements were verifiably false, but made them with the express understanding that they would cause financial harm to Plaintiffs.

### **FOURTH CLAIM FOR RELIEF**
### **(Unfair Competition)**

51. Plaintiffs incorporate by reference Paragraphs 1 through 27 of this Complaint as though fully set forth herein.

52. Mahama's actions as hereinabove alleged are unfair, unlawful and fraudulent in that Mahama knowingly, willfully and with intent to damage Plaintiffs challenged the ownership and authenticity of the Installation Pieces, the Individual Works and the California Works in order to eliminate competition for the sale of his own, different artworks.

53. As a result of Mahama's actions as hereinabove alleged, Plaintiffs have suffered damages from the impact on the market for their inventory of unsold Individual Works and the California Works.

54. Based on the foregoing, in addition to other damages and remedies available to them, Plaintiffs are entitled to restitution for amounts they have expended in connection with the Installation Pieces, the Individual Works and the California Works, and are further entitled to injunctive relief precluding Mahama from engaging in unfairly competitive business practices including, without limitation, falsely representing that the Individual Works and the California Works are not authentic.

## FIFTH CLAIM FOR RELIEF

### (Specific Performance)

55. Plaintiffs incorporate by reference Paragraphs 1 through 25 of this Complaint as though fully set forth herein.

56. Plaintiffs and Mahama entered into a valid and binding Contract as alleged above.

57. Plaintiffs have performed and are continuing to perform all of their obligations under the Contract.

58. In addition to Mahama's contractual breaches as alleged above, Mahama failed and refused to sign the California Works, thereby placing those works' authenticity in question. Each of the unsigned pieces was created at the same time, in the same place, by the same person (Atkins), in the same manner, from the same materials, and for the same cost to Plaintiffs as the works Mahama did sign. On information and belief, Mahama did not provide any reason why he failed to sign the California Works.

59. Bearing Mahama's signature to verify their authenticity and provenance, the California Works may be sold for approximately $16,700 each. Without his signature, the pieces are simply jute coal sacks mounted to wooden frames, which impacts their commercial value.

60. In light of the foregoing, Plaintiffs seek an order for specific performance requiring Mahama to either sign the California Works or otherwise provide sufficient documentation to attest to their authenticity and provenance. Alternatively, in addition to the other contractual damages prayed for herein, Plaintiffs seek from Mahama the equivalent value of 15 signed Individual Works, an amount equal to at least $250,500.

## SIXTH CLAIM FOR RELIEF

**(Declaratory Relief)**

61. Plaintiffs incorporate by reference Paragraphs 1 through 25 of this Complaint as though fully set forth herein.

62. As alleged hereinabove, Plaintiffs paid Mahama $148,500 for the Lots, two of which were assembled and erected at Plaintiffs' expense as the Installation Pieces, which pieces are owned by Plaintiffs.

63. Also alleged hereinabove, the Individual Works and the California Works were created with Mahama's knowledge, consent, oversight and approval. Following their creation Mahama authenticated the Individual Works by personally signing them. Overall, Plaintiffs spent approximately $225,000 in payments to Mahama, in paying for and importing the Lots, creating the Installation Pieces, promoting and hosting the Exhibit, and creating the Individual Works and the California Works.

64. Despite the foregoing, on information and belief, Mahama now asserts ownership of the Installation Pieces and disputes the authenticity of the Individual Works and the California Works.

65. Absent a declaration that the Individual Works and the California Works are authentic, Plaintiffs will suffer millions of dollars in damages because they will not be able to sell their inventory of unsold Individual Works and California Works.

66. In addition, absent a declaration that the Individual Works are authentic, Plaintiffs may be required to refund the payments received from buyers of the 27 Individual Works already sold.

67. An actual and justiciable controversy exists between the parties as to copyright ownership of the Installation Pieces as well as the pieces themselves.

68. An actual and justiciable controversy exists between the parties as to the authenticity of the Individual Works and the California Works. Plaintiffs

therefore seek a declaration that: (1) Plaintiffs own the Installation Pieces, and (2) the Individual Works and the California Works are, in fact, authentic.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment as follows:

1. On the first claim for breach of contract, for an order for actual damages in the amount Plaintiffs have been damaged as a result of Mahama's breach of the Contract, in an amount to be proved at trial but estimated at approximately $4,450,000;

2. On the second claim for fraudulent inducement, for an order for actual damages as a result of Mahama's fraudulently inducing Plaintiffs to enter and perform under the Contract, in an amount to be proved at trial but estimated at approximately $4,450,000, plus punitive damages.

3. On the third claim for commercial disparagement, for an order for actual damages and punitive damages as a result of Mahama's malicious and knowingly false statements regarding the authenticity of the Individual Works and the California Works;

4. On the fourth claim for unfair competition, for an order requiring Mahama to pay restitution for amounts Plaintiffs expended in connection with the Installation Pieces, the Individual Works and the California Works, and enjoining Mahama from engaging in unfair competitive business practices including, without limitation, falsely representing that the Individual Works and the California Works are not authentic;

5. On the fifth claim for specific performance, for an order requiring Mahama to either sign the California Works or otherwise provide sufficient documentation to attest to their authenticity and provenance or, alternatively, in addition to the other contractual damages prayed for herein, the equivalent value of 15 signed Individual Works, an amount equal to at least $250,500;

1. 6. On the sixth claim for declaratory relief, for an order declaring that: (1) Plaintiffs own the Installation Pieces, and (2) the Individual Works and the California Works are authentic;
2. 7. For costs of suit herein incurred;
3. 8. For attorneys' fees on claims allowing such fees; and
4. 9. For such other and further relief as the Court deems just.

**DAVID STEINER & ASSOCIATES**

By: /s/ David P. Steiner
      DAVID P. STEINER
      JONATHAN BALFUS
Attorney for Plaintiffs SIMCOR LLC
and ELLIS KING LTD.

**THE RUDD LAW FIRM, A P.C**

By: /s/ Christopher L. Rudd
      CHRISTOPHER L. RUDD
Attorney for Plaintiff SIMCOR LLC

| | |
|---|---|
| 1 | **JURY TRIAL DEMAND** |
| 2 | Plaintiffs request trial by jury of all issues so triable. |

**DAVID STEINER & ASSOCIATES, PLC**

By: /s/ David P. Steiner
    DAVID P. STEINER
    JONATHAN BALFUS
Attorney for Plaintiffs SIMCOR LLC
and ELLIS KING LTD.